SIM-AIR, USA, LTD., PETITIONER *v.*
COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 5344-89.          Filed February 24, 1992.

*David L. Haga* and *Robert P. Solliday,* for petitioner.
*Robert A. Johnson,* for respondent.

TANNENWALD, *Judge:*[1] Respondent determined deficiencies in petitioner's Federal income taxes as follows: (1) $1,292,189 for the fiscal year ended July 31, 1984, and additions to tax of $64,609 under section 6653(a)(1)[2] and interest on $1,292,189 under section 6653(a)(2); (2) $3,467 for the short fiscal year ended December 31, 1984, and additions to tax of $173 under section 6653(a)(1) and interest on $3,467 under section 6653(a)(2). Respondent having conceded the short-year deficiency, the issue for decision is whether petitioner is entitled to be classified as a domestic international sales corporation (DISC) for its fiscal year ended July 31, 1984. If we decide that petitioner is not so entitled, then we will need to dispose of the determinations of the additions to tax and to deal with the question whether petitioner is entitled to make a deficiency distribution in accordance with section 992(c).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found; the stipulation and accompanying exhibits are incorporated herein by reference.

Petitioner is an Arizona corporation with its principal place of business in Scottsdale, Arizona, at the time the petition herein was filed. At all pertinent times, it was a 100-percent owned subsidiary of Air Services International, Inc. (ASI), a Delaware corporation. Robert Wachs (Wachs) and his wife owned all of the issued and outstanding stock of ASI.

---

[1] This case was reassigned to Judge Tannenwald by order of the Chief Judge dated Dec. 6, 1991.

[2] All statutory references are to the Internal Revenue Code as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Petitioner was incorporated in 1979 on the recommendation of Murray Mindlin (Mindlin) to take advantage of the provisions of the Internal Revenue Code relating to DISC's. Mindlin has been doing all the tax work for ASI and its subsidiaries since 1978, when he was with the accounting firm of Acone & Co. Acone & Co. merged with Laventhol & Horwath, a nationally known accounting firm, in 1982. Since the merger, Laventhol & Horwath has been ASI's outside accountant, and Mindlin has been the partner in charge of ASI's account.

On April 30, 1981, ASI purchased two helicopters from Bell Helicopter (Bell) one of which had the serial number 31176 and registration number 3910K (hereinafter referred to as the helicopter). It is the only helicopter involved in this proceeding.[3] A book entry was made on August 1, 1981, transferring the helicopter to petitioner, but the certificate of title was not changed from ASI to petitioner.

The helicopter was the subject of a conditional sales agreement in respect of the payment to Bell of the $1,482,043 purchase price.

On December 31, 1983, on the advice of Mindlin, who was concerned that proposed legislation would eliminate the DISC provisions of the Internal Revenue Code, Aviation Supply Co. (Supply) was formed as a 100-percent owned subsidiary of ASI and the helicopter was transferred to Supply.[4] The certificate of title to the helicopter in ASI was not changed to reflect the transfer.

On October 3, 1984, ASI and its subsidiaries were experiencing substantial financial difficulties, and ASI was in default under the conditional sales contract. As a result of discussions between Wachs and officials of Bell, the helicopter was transferred back to Bell and ASI executed, as seller, a bill of sale to Bell reflecting the transfer. The transfer was made to avoid forcible repossession by Bell of other ASI helicopters. On June 5, 1985, Bell contracted to sell the helicopter to Helitrade Ltd. and delivered it to Helitrade on October 21, 1985, for export to Switzerland.

---

[3]The deficiency notice involved two other helicopters, but, as a result of a concession by respondent, they are no longer in issue herein.

[4]The record herein is not clear on this point, but respondent has stated that he presumes that it was so transferred.

When the helicopter was purchased from Bell in 1981, it contained equipment designed to enable it to be used outside the United States, in particular to facilitate its use in a joint venture in Egypt; some of this equipment was removable, but, in any event, its presence did not preclude the possibility of operation within the United States. The joint venture never materialized. At all times since its acquisition by ASI until its reacquisition by Bell in 1985, the helicopter was stored at the Scottsdale, Arizona, airport.

Mindlin was continuously involved in the handling of the various transactions relating to the helicopter by ASI, petitioner, and Supply. Since 1978, he was the source of tax advice to ASI and its subsidiaries, and to Wachs personally.

Petitioner filed its DISC return (Form 1120-DISC) for the fiscal year ended July 31, 1984, on March 18, 1985.

### OPINION

Section 992(a)(1) defines a DISC to include a domestic corporation which satisfies the following conditions among others not involved herein:

(A) 95 percent or more of the gross receipts * * * consist of *qualified export receipts* (as defined in section 993(a)),
(B) the adjusted basis of the qualified export assets (as defined in section 993(b)) of the corporation at the close of the taxable year equals or exceeds 95 percent of the sum of the adjusted basis of all assets of the corporation at the close of the taxable year,
[Emphasis added.]

Paragraph (1) of section 993(a) specifies that:

except as provided by regulations under paragraph (2), the *qualified export receipts* of a corporation *are—*
   (A) *gross receipts from the sale, exchange, or other disposition of export property,*
[Emphasis added.]

Paragraph (2) provides in pertinent part:

(2) EXCLUDED RECEIPTS.—The Secretary may under regulations designate receipts from the sale, exchange, lease, rental, or other disposition of export property, and from services, as not being receipts described in paragraph (1) if he determines that such sale, exchange, lease, rental, or other disposition, or furnishing of services—

(A) *is for ultimate use in the United States;*
[Emphasis added.]

## Section 993(c)(1) provides in pertinent part that:

the term "export property" means property—

\*      \*      \*      \*      \*      \*      \*

(B) held primarily for sale, lease, or rental, in the ordinary course of trade or business, by, or to, a DISC, *for direct use, consumption, or disposition outside the United States,*
[Emphasis added.]

## Section 993(b) provides in pertinent part that:

the qualified export assets of a corporation are—

\*      \*      \*      \*      \*      \*      \*

(3) accounts receivable and evidences of indebtedness which arise by reason of transactions of such corporation or of another corporation which is a DISC and which is a member of a controlled group which includes such corporation described in subparagraph (A), (B), (C), (D), (G), or (H), of subsection (a)(1);

## The provisions of the regulations implementing the foregoing statutory provisions are sections 1.993-1(j) and 1.993-3(a) and (d), Income Tax Regs., which provide in pertinent part:

Sec. 1.993-1(j)  Excluded receipts—(1) In general.  Notwithstanding the provisions of paragraphs (b) through (i) of this section, qualified export receipts of a DISC do not include any of the five amounts described in subparagraphs (2) through (6) of this paragraph.

(2) Sales and leases of property for ultimate use in the United States. *Property which is sold or leased for ultimate use in the United States* does not constitute export property (relating to determination of where the ultimate use of the property occurs).  See sec. 1.993-3(d)(4) [Income Tax Regs.]. Thus, qualified export receipts of a DISC described in paragraph (b) or (c) of this section do not include gross receipts of the DISC from the sale or lease of such property.

\*      \*      \*      \*      \*      \*      \*

Sec. 1.993-3. Definition of export property.

(a) General rule.  Under section 993(c), except as otherwise provided with respect to excluded property in paragraph (f) of this section and with respect to certain short supply property in paragraph (i) of this section, export property is property in the hands of any person (whether or not a DISC)—

\*      \*      \*      \*      \*      \*      \*

(2) Held primarily for sale or lease in the ordinary course of a trade or business to any person *for direct use, consumption, or disposition outside the United States (see paragraph (d) of this section),*

\*     \*     \*     \*     \*     \*     \*

(d) Primary purpose for which property is held—(1) In general—(i) General rule.  Under paragraph (a)(2) of this section, export property (a) must be held primarily for the purpose of sale or lease in the ordinary course of a trade or business to a DISC, or to any other person, and (b) *such sale or lease must be for direct use, consumption, or disposition outside the United States.*  Thus, property cannot qualify as export property unless it is sold or leased for direct use, consumption, or disposition outside the United States. Property is sold or leased for direct use, consumption, or disposition outside the United States if such sale or lease satisfies the destination test described in subparagraph (2) of this paragraph, \* \* \*

\*     \*     \*     \*     \*     \*     \*

(2) Destination test.—(i) For purposes of subparagraph (1) of this paragraph, the destination test in this subparagraph is satisfied with respect to property sold or leased by a seller or lessor only if it is delivered by such seller or lessor (or an agent of such seller or lessor) regardless of the F.O.B. point or the place at which title passes or risk of loss shifts from the seller or lessor—

\*     \*     \*     \*     \*     \*     \*

(b) Within the United States to a purchaser or lessee, *if such property is ultimately delivered, directly used, or directly consumed outside the United States* (including delivery to a carrier or freight forwarder for delivery outside the United States) by the purchaser or lessee (or a subsequent purchaser or sublessee) *within 1 year after such sale or lease,*

\*     \*     \*     \*     \*     \*     \*

(4) *Sales and leases of property for ultimate use in the United States*—(i) In general.  For purposes of subparagraph (1) of this paragraph, the use test in this subparagraph is satisfied with respect to property which—

(a) Under subdivisions (ii) through (iv) of this subparagraph is not sold for ultimate use in the United States or

\*     \*     \*     \*     \*     \*     \*

(ii) *Sales of property for ultimate use in the United States.*  For purposes of subdivision (i) of this subparagraph, a purchaser of property (including components, as defined in subdivision (vii) of this subparagraph) is deemed to use such property ultimately in the United States if any of the following conditions exists:

\*     \*     \*     \*     \*     \*     \*

(iii) Use in the United States.  For purposes of subdivision (ii) of this subparagraph, property (including components incorporated into a second product) is or would be ultimately used in the United States by such purchaser *if, at any time within 3 years after the purchase of such property or components, either such property or components (or the second product into which such components are incorporated) is resold by such purchaser for use by a subsequent purchaser within the United States or such purchaser or subsequent purchaser fails, for any period of 365 consecutive days, to use such*

*property or second product predominantly outside the United States as defined in subdivision (vi) of this subparagraph).*
   [Emphasis added.]

The statute and regulations governing DISC's are a baffling maze of complicated rules and conditions. We have set forth the pertinent provisions in detail in order to provide a backdrop for dealing with the principal issue involved herein, namely, whether petitioner is subject to the 1-year limitation in section 1.993-3(d)(2)(i)(*b*), Income Tax Regs., or the 365-day limitation of the section 1.993-3(d)(4)(iii), Income Tax Regs. Failure to meet either limitation will cause petitioner to lose its DISC status for the taxable year at issue.

Petitioner's main attack is directed to the asserted invalidity of both limitations on the ground that they create conditions of qualification not warranted by the statutory provisions. As a further position, petitioner argues that the repossession of the helicopter by Bell in October 1984 made it impossible for it to comply with the limitations even if they are valid and that therefore it should be excused from compliance. Respondent contends that the limitations constitute reasonable implementations of the statutory definition of "export property" contained in section 993(c)(1), namely property "held primarily for sale, lease, or rental in the ordinary course of trade or business * * * for direct use, consumption, or disposition outside the United States".

Initially, we note that the record is spotty as to whether the helicopter satisfied the statutory requirement of property "held for sale", irrespective of destination, after the Egyptian venture fell through in 1982. However, respondent has not contended that, aside from the 1-year and 365-day time limitations, petitioner failed to satisfy the statutory requirements, and we therefore see no need to expand our inquiry beyond the framework established by the parties.

Initially, we observe that Treasury regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes," and "should not be overruled except for weighty reasons." *Bingler v. Johnson,* 394 U.S. 741, 750 (1969) (quoting *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501 (1948)). On the other hand, as we stated in *CWT Farms, Inc. v. Commissioner,* 79 T.C. 1054, 1062 (1982), affd. 755 F.2d 790 (11th Cir. 1985):

judicial deference is not a substitute for judicial scrutiny and analysis. A regulation which contradicts the unambiguous language of the statute it purports to interpret cannot stand. Moreover, where the statute is unambiguous, and there is no valid reason for adding a requirement to those the statute already provides, the Commissioner may not usurp congressional authority by adding such a requirement by regulation. Finally, although a regulation does not clearly contradict or limit the provisions of the statute it purports to interpret, it is nonetheless invalid if it is inconsistent with the statute's origin and purpose. [Citations omitted.]

These principles apply to both legislative and interpretative regulations with the former being entitled to an especially high degree of deference. *Pepcol Manufacturing Co. v. Commissioner,* 98 T.C. 127 (1992). While there may be a question as to whether some or all of the above-quoted regulations fall within the scope of section 993(a)(2), see *supra* pp.190-191, and are therefore "legislative", we find it unnecessary to resolve this question. We have concluded that, at least for the purposes of this case, section 1.993-3(d)(2)(i)(*b*), Income Tax Regs., see *supra* p. 192, is an "interpretative" regulation and that the 1-year limitation contained therein is valid. Cf. *Gehl Co. v. Commissioner,* 795 F.2d 1324, 1328-1330 (7th Cir. 1986), affg. T.C. Memo. 1984-667. See *Thomas International Ltd. v. United States,* 773 F.2d 300, 303 (Fed. Cir. 1985); *CWT Farms, Inc. v. Commissioner,* 755 F.2d at 801.

Petitioner argues that the 1-year disposition requirement of section 1.993-3(d)(2)(i)(*b*), Income Tax Regs., imposes an unwarranted condition on the statutory definition of "export property" set forth in section 993(c)(1)(B), see *supra* p. 191, namely, that such property be "held primarily for sale * * * in the ordinary course of trade or business * * * *for direct use* * * * *outside the United States*" (emphasis added). Petitioner maintains that the helicopter was at all times held by it for the statutory purpose and that the fact that Bell did not dispose of the helicopter for use outside the United States within 1 year of the sale to ASI should be disregarded. We disagree with petitioner that the language of section 993(c)(1)(B) demands such a rigid interpretation.

The legislative objective of the DISC provisions was to stimulate exports from the United States. See, e.g., *Thomas International Ltd. v. United States,* 773 F.2d at 301; *CWT Farms, Inc. v. Commissioner,* 79 T.C. at 1065. Basically, sec-

tion 993(c)(1)(A) establishes a purpose standard designed to assure that such legislative objective will be achieved.

We think the requirement of section 1.993-3(d)(2)(i)(*b*), Income Tax Regs., that a purchaser from a DISC take the necessary steps to assure its use outside the United States, is a reasonable condition of securing compliance with the statutory purpose that the property be utilized for export purposes and comports particularly with the statutory provision for *direct* use, etc. The additional requirement that these steps be taken within 1 year of the acquisition from the DISC is equally reasonable. Moreover, we note that the regulation does not go so far as to impose a requirement that the DISC actually make a sale during the year in order to insure that there is compliance with the "direct use" provision.[5] It merely requires that, if a sale occurs, the DISC must comply with that provision either by virtue of the circumstances of that sale or take steps to insure that the purchaser complies with the 1-year limitation. Petitioner seizes on the language of section 1.993-3(d)(1), Income Tax Regs., that "property cannot qualify as export property unless it is sold or leased for direct use, consumption, or disposition outside the United States", and the language of section 1.993-1(j), Income Tax Regs., which speaks in terms of "Sales * * * of property for ultimate use in the United States",[6] see *supra* pp. 191-192, to construct the requirement of a mandatory sale by the DISC. While such language, standing alone, would appear to support petitioner's position, the fact of the matter is that it does not. If that language is read, as we think it should be, in the context of the regulations as a whole and in light of the use of the phrase "ultimate use in the United States" in the statute itself, see section 993(a)(2), *supra* pp. 190-191, it is apparent that it applies only if a sale by the DISC is actually made. If petitioner were correct, the escape hatches in the regulations, e.g, the 1-year or 365-day limitations, would be unnecessary. Our interpretation that no actual sale is necessary to satisfy the "held primarily for sale" requirement makes irrelevant petitioner's assertion that the

---

[5]The absence of a sale will be an element to be considered in determining whether the statutory requirement of "held primarily for sale * * * in the ordinary course of trade or business" has been satisfied.

[6]Similar language relating to ultimate use appears in sec. 1.993-3(d)(4), Income Tax Regs. See *supra* pp. 191-192.

regulation is invalid because it fails to take into account such events as returns of defective property, destruction loss of the property as the result of a casualty, etc.

In an analogous situation, the courts have uniformly sustained section 1.994-1(e)(3), Income Tax Regs., which imposes a 60-day payment requirement in order for certain accounts receivable to constitute "qualified export assets" within the meaning of section 992(a)(1). *L&F International Sales Corp. v. United States,* 912 F.2d 377 (9th Cir. 1990); *Gehl v. Commissioner, supra; Thomas International Ltd. v. United States, supra; LeCroy Research Systems Corp. v. Commissioner,* 751 F.2d 123 (2d Cir. 1984), revg. on other grounds T.C. Memo. 1984-145; CWT *Farms, Inc. v. Commissioner, supra.* See *Addison International, Inc. v. Commissioner,* 887 F.2d 660, 665 n.5 (6th Cir. 1989), affg. 90 T.C. 1207 (1988). We find unpersuasive petitioner's attempt to distinguish these cases and the application of their rationale herein.

In other situations, similar objective tests have been established for determining whether a comparable legislative standard has been satisfied. Thus, in determining whether property is "held * * * primarily for sale to customers in the ordinary course of his [the taxpayer's] trade or business", within the meaning of section 1221(1), the courts have established several objective criteria for determining a taxpayer's purpose in holding property, which involve an evaluation of the nature and extent of the taxpayer's activities. See, e.g., *Guardian Industries Corp. v. Commissioner,* 97 T.C. 308, 316-317 (1991). Similarly, objective criteria focusing on the nature and extent of a taxpayer's activity sufficient to constitute "an activity not engaged in for profit" have been established by regulations which have received judicial sanction. See *Keanini v. Commissioner,* 94 T.C. 41, 47 (1990); sec. 1.183-2(b), Income Tax Regs.

In sum, we are satisfied that the statutory language "held for sale * * * for *direct use* * * * outside the United States" is sufficiently imprecise to permit an interpretative regulation and that the regulation in question meets the required standard of reasonableness and consistency with the applicable statute. See *supra* p. 193. Moreover, for the reasons hereinafter set forth, see *infra* pp. 197-198, for refusing to relieve petitioner from compliance with the regulation because of the

retransfer of the helicopter to Bell, we reject petitioner's argument that the failure of the regulations to afford it the claimed relief causes the regulations to be invalid. We hold that the 1-year limitation contained in section 1.993-3(d)(2)(i)(*b*), Income Tax Regs., is valid and that, since petitioner has failed to satisfy the regulation, it is not entitled to be classified as a DISC during the taxable year at issue. As we have previously noted, see *supra* pp. 192-193, the 1-year limitation of section 1.993-3(d)(2)(i)(*b*), Income Tax Regs., and the 365-day limitation of section 1.993-3(d)(4)(iii) are dual requirements. Petitioner's failure to satisfy the former makes it unnecessary for us to consider the validity of the latter.

Petitioner also argues that, even if the 1-year requirement of the regulations is held to be valid, it should be excused from compliance with it (or, for that matter, the 365-day requirement) because: (1) The transfer to Bell was involuntary because of the default in making payments and the consequent right of repossession in Bell, or (2) at the time of the transfer to Bell, almost 3 months remained of the 1-year period after the sale to Air Services, with the result that Air Services was deprived of the full period for compliance accorded by the regulation. We disagree.

Initially, we note that the record is far from clear that the transfer to Bell was involuntary. It was apparently made as the result of negotiations which involved enabling petitioner to retain other Bell helicopters owned by petitioner and/or its subsidiaries. At a minimum, we cannot conclude that petitioner has carried its burden of proof on this score. Moreover, the transfer was accomplished by a bill of sale from Air Services to Bell. Such a transfer has been equated with a sale where a mortgagor has voluntarily conveyed the property without consideration to a mortgagee in lieu of foreclosure. *Freeland v. Commissioner,* 74 T.C. 970 (1980). Cf. *Central Tablet Manufacturing Co. v. United States,* 417 U.S. 673, 689 (1974), wherein the Supreme Court held that a fire constituted a sale or exchange and prevented prior adoption of a plan of complete liquidation as required by section 337, pointing out, as an analogy, the proposition that the destruction of property terminates the holding period for the purpose of long-term or short-term gain or loss. Furthermore, the circumstance that an unanticipated event prevented compliance with a time limita-

tion has not, in other contexts, relieved a taxpayer from such compliance. *Central Tablet Manufacturing Co. v. United States, supra.*[7] A similar result has been reached where a statutory condition cannot be met. *Fullilove v. United States,* 71 F.2d 852 (5th Cir. 1934). See *Maloof v. Commissioner,* 65 T.C. 263, 271-272 (1975); *United Development Co. v. United States,* 212 F. Supp. 664, 667 (E.D. Mo. 1962). That the limitations in these analogous cases were statutorily imposed, as contrasted with the imposition by regulations herein, is an element which provides no sustenance to petitioner. Once a regulation is sustained as a valid exercise of the powers of the Secretary of the Treasury, it has the force and effect of law. *Boske v. Comingore,* 177 U.S. 459 (1900); *Mearkle v. Commissioner,* 87 T.C. 527, 530 (1986), revd. and remanded on other grounds 838 F.2d 880 (6th Cir. 1988).

Petitioner's reliance on *Penn Yan Agway Cooperative, Inc. v. United States,* 189 Ct. Cl. 434, 417 F.2d 1372 (1969), and *Mississippi Chemical Corp. v. United States,* 431 F.2d 1320 (5th Cir. 1970), revd. on other grounds 405 U.S. 298 (1972), is misplaced. Those cases involved a determination as to the proper treatment of payments for stock in excess of its fair market value where the impossibility of marketability due to restrictions on the stock was simply one factor which was taken into account. They are clearly distinguishable. In sum, we reject petitioner's contentions as to whether the repossession by Bell and/or the fact that the full year had not expired at the time of such repossession excused it from compliance with the 1-year limitation of the regulation.

We are not unaware that taxpayers, in petitioner's position, may have little, if any, ability to impose conditions on the reacquisition of property by a creditor. This may well be a situation that should be alleviated, but a decision in this respect involves a policy determination which it is up to the Congress, not the courts, to make. *Chronicle Publishing Co. v. Commissioner,* 97 T.C. 445 (1991).

As far as the additions to tax under section 6653(a)(1) and (2) are concerned, we are satisfied on the basis of the record as a whole that the instant case falls within the ambit of cases holding a taxpayer not liable for such additions where there

---

[7]Cf. *Bazzell v. Commissioner,* T.C. Memo. 1967-101.

has been bona fide reliance on professional advice even though that advice turned out to be erroneous, particularly in light of the complex DISC provisions of the Internal Revenue Code. Cf. *United States v. Boyle,* 469 U.S. 241, 250-251 (1985); *Jackson v. Commissioner,* 86 T.C. 492, 539 (1986), affd. 864 F.2d 1521 (10th Cir. 1989). We reject respondent's attempt to characterize Mindlin as being, in effect, a principal in petitioner's affairs and thus depriving petitioner, through Wachs, of the right to rely on him as a professional adviser.

Finally, we need to dispose of the arguments of the parties in respect of a deficiency distribution in compliance with section 992(c). Paragraph (1) of that section provides that, if a corporation fails to satisfy the export receipts or export assets requirements of a DISC for the taxable year in question, it may still be entitled to be treated as a DISC if it makes a deficiency distribution of the appropriate amount to its shareholders. In order to be able to claim the benefit of paragraph (1), the corporation's failure to meet the above-mentioned DISC requirements and the failure to make an earlier distribution must be "due to reasonable cause"; additionally, the corporation must pay to the Secretary a specified amount as interest. See sec. 992(c)(2).[8]

---

[8]The pertinent provisions of sec. 992 are as follows:

SEC. 992(c). DISTRIBUTIONS TO MEET QUALIFICATION REQUIREMENTS.—

(1) IN GENERAL.—Subject to the conditions provided by paragraph (2), a corporation which for a taxable year does not satisfy a condition specified in paragraph (1)(A) (relating to gross receipts) or (1)(B) (relating to assets) of subsection (a) shall nevertheless be deemed to satisfy such condition for such year if it makes a pro rata distribution of property after the close of the taxable year to its shareholders (designated at the time of such distribution as a distribution to meet qualification requirements) with respect to their stock in an amount which is equal to—

(A) if the condition of subsection (a)(1)(A) is not satisfied, the portion of such corporation's taxable income attributable to its gross receipts which are not qualified export receipts for such year,

(B) if the condition of subsection (a)(1)(B) is not satisfied, the fair market value of those assets which are not qualified export assets on the last day of such taxable year, or

(C) if neither of such conditions is satisfied, the sum of the amounts required by subparagraphs (A) and (B).

(2) REASONABLE CAUSE FOR FAILURE.—The conditions under paragraph (1) shall be deemed satisfied in the case of a distribution made under such paragraph—

(A) if the failure to meet the requirements of subsection (a)(1)(A) or (B), and the failure to make such distribution prior to the date on which made, are due to reasonable cause; and

(B) the corporation pays, within the 30-day period beginning with the day on which such distribution is made, to the Secretary, if such corporation makes such distribution after the 15th day of the 9th month after the close of the taxable year, an amount determined by multiplying (i) the amount equal to 4½ percent of such distribution, by (ii) the number of its taxable years which begin after the taxable year with respect to which such distribution is made and before such distribution is made. For purposes of this title, any payment made pursuant to this paragraph shall be treated as interest.

The pertinent part of the regulations implementing section 992(c)(1) and (2) are as follows:

(2) Determination of reasonable cause. In general, whether a corporation's failure to meet the 95 percent of gross receipts test, the 95 percent assets test, or both tests for a taxable year and its failure to make a pro rata dis-tribution prior to the date on which it was made will be considered for rea-sonable cause where the action or inaction which resulted in such failure occurred *in good faith,* such as failure to meet the 95 percent assets test resulting from blocked currency or expropriation, or *failure to meet either test because of reasonable uncertainty as to what constitutes a qualified export receipt or a qualified export asset.* For further examples, if a corporation's reasonable determination of the percentage of its total gross receipts that are qualified export receipts is subsequently redetermined to be less than 95 percent as a result of a price adjustment by the Internal Revenue Service under section 482, or if the corporation has a casualty loss for which it receives an unanticipated insurance recovery which causes its qualified export receipts to be less than 95 percent of its gross receipts, then the failure to satisfy the 95 percent of gross receipts test is considered to be due to reasonable cause.

(3) Time limit for deficiency distribution. Except as otherwise provided in this subparagraph, the time limit prescribed by this subparagraph for making a deficiency distribution is satisfied if the amount of the distribution required by paragraph (b) of this section is made within 90 days from the date of the first written notification to the corporation by the Internal Revenue Service that it had not satisfied the 95 percent of gross receipts test or the 95 percent assets test or both tests, for a taxable year. Upon a showing by the corporation that an extension of the 90-day time limit is reasonable and necessary, the Commissioner may grant such extension of such time limit. *In any case in which a corporation contests the decision of the Internal Revenue Service that such corporation has not met the 95 percent of gross receipts test, the 95 percent assets test, or both tests, an extension of the 90-day time limit will be allowed until 30 days after the final determination of such contest.* The date of the final determination of such contest shall, for purposes of section 992(c), be established in the manner specified in subdivisions (i) through (iv) of this subparagraph:

(i) the date of final determination by a decision of the United States Tax Court is the date upon which decision became final, as prescribed in section 7481.

[Sec. 1.992-3(c)(2) and (3), Income Tax Regs.; emphasis added. See also H. Rept. 92-533 (1971), 1972-1 C.B. 498.]

The issue upon which the parties have locked horns is whether petitioner's failure to make the requisite distribution was "due to reasonable cause". As we indicated in *CWT Farms, Inc. v. Commissioner,* 79 T.C. at 1059, it may well be premature for us to resolve this issue, prior to the time that a distribution is made. See also *Garnac Grain Co. v. Commissioner,*

T.C. Memo. 1991-363. However, unlike the situation in those cases, we have had to resolve the issue of negligence under section 6653(a)(1) and (2), and our resolution of that issue greatly facilitates the disposition of the "reasonable cause" issue. Given this factor and in light of the fact that the parties have briefed the "reasonable cause" issue, we will proceed to decide it, at least partially, leaving the ultimate consequences of any distributions which petitioner may make to future disposition. Cf. *Garnac Grain Co. v. Commissioner, supra.* We note, however, that a conclusion in respect of the imposition of the additions to tax under section 6653(a)(1) and (2) is not necessarily determinative of compliance or noncompliance with the "reasonable cause" requirements of section 1.992-2(c)(2), Income Tax Regs., since different factors and timing may be involved in that determination.

Respondent concedes that petitioner's failure to make a distribution prior to the end of its 1984 fiscal year was reasonable because the 1-year period after the sale to ASI had not then expired. However, respondent contends that since that period had expired by the time petitioner filed its return for the fiscal year on March 18, 1985, petitioner's failure to make the requisite deficiency distribution prior to that date was not "due to reasonable cause". We think otherwise. Petitioner's reliance on Mindlin's advice carried over at least until petitioner was notified of respondent's position. After that point of time, petitioner was entitled to the benefit of the provision of the regulations (see emphasized sentence, quoted *supra* p. 200) dealing with contests of the decision of the Internal Revenue Service. Leaving aside the issue whether this provision affords an automatic compliance with the "good faith" requirement, we note that petitioner's argument against respondent's position is that it believed that the retransfer of the helicopter to Bell was an event which excused it from the 1-year limitation, a belief which it asserts meets the test of "reasonable uncertainty as to what constitutes a qualified export receipt" or a qualified export asset and therefore constitutes a "good faith" basis for failure to make a deficiency distribution. See sec. 1.992-3(c)(2), Income Tax Regs., *supra* pp. 200-201. While we have concluded otherwise as to the impact of the retransfer on the issue of petitioner's compliance with the 1-year limitation as such, we agree that the question was sufficiently in doubt so as to

sustain petitioner's position in respect of the application of the regulations under section 992(c).[9]

We hold that petitioner has satisfied the "reasonable cause" requirement of section 992(c)(2) in respect of its failure thus far to make the requisite deficiency distribution.

Finally, we deal with the problem of how to compute the deficiency herein since it will be affected by distributions which have not yet been made. In an attempt to cut this Gordian knot, perhaps more understandably described as "which comes first, the chicken or the egg", we will withhold that decision and afford the parties an opportunity either to settle the amount required to be distributed and the timing thereof or to present to the Court any problems relating thereto. In this connection, the parties may wish to suggest a procedure for the timing of payment that will permit the Court to enter a decision and at the same time preserve each party's right of appeal, if they desire to retain such right. Such a procedure will also afford petitioner an opportunity to decide whether it wishes to make such a distribution; it never affirmatively states that it intends to do so if it is otherwise held not to qualify as a DISC. It will also afford respondent the opportunity to seek a determination by the Court as to whether petitioner has continued to satisfy the "reasonable cause" requirement of section 1.992-3(c)(2), Income Tax Regs. In submitting their views as to such procedure, the parties shall include a discussion of the impact of the time of the "interest" payment provision of section 999(c)(2)(B), see *supra* note 7.

*An appropriate order will be issued.*

---

[9]It appears that petitioner's contention, in respect of the invalidity of the 1-year limitation, did not develop until after the dispute with respondent first arose. In light of this circumstance and the resulting dual positions asserted by petitioner, we have no need to determine the impact of *Druker v. Commissioner*, 697 F.2d 46, 52-56 (2d Cir. 1982), revg. in part 77 T.C. 867, 874-876 (1981), dealing with intentional disregard of regulations.